IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 8, 2011

**STATE OF TENNESSEE v. KENNETH JAMES WATKINS**

**Appeal from the Criminal Court for Davidson County**
**No. 2009-A-41     J. Randall Wyatt, Jr., Judge**

**No. M2010-00886-CCA-R3-CD - Filed August 11, 2011**

The Defendant, Kenneth James Watkins, was convicted by a Davidson County Criminal Court jury of premeditated first degree murder and was sentenced to life in prison. See T.C.A. § 39-13-202 (2010). On appeal, the Defendant contends that (1) the evidence was insufficient to support the conviction, (2) the trial court erred by denying his motion to suppress identification, (3) the trial court erred by allowing testimony regarding his nickname, and (4) the trial court erred by allowing testimony regarding threats against a witness and witnesses' fear of reprisal. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Dawn Deaner, District Public Defender, and Jeffrey A. DeVasher, Assistant District Public Defender (on appeal); Jonathan F. Wing and Tyler Chance Yarbro, Assistant District Public Defenders (at trial), for the appellant, Kenneth James Watkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Amy Eisenbeck, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the shooting death of Michael S. Mayfield. At the trial, Pamela McClish testified that on June 7, 2008, she lived in the Andrew Jackson Homes in Davidson County and that she was home in bed when she heard three or four gunshots at 1:00 or 1:30 a.m. She said that she rolled out of bed and onto the floor and that she told her uncle to get

down from the couch and onto the floor. She said she remained on the floor for about five minutes because she was afraid of being shot. When they looked outside, they saw a body lying on a wheelchair ramp beside her home.

Ms. McClish identified two photographs of the scene outside her window on June 7, 2008, and testified that the photographs showed a man lying dead on the ramp. She said the "cut" at the Andrew Jackson Homes was an opening in the fence where people cut through the fence to get from Sixteenth Street to Blank Street. She said that the cut was at the bottom left of the wheelchair ramp, that Blank Street was a block away, and that a parking lot with dumpsters was between the cut and Blank Street. She had stopped walking through the cut because there were "always gunshots back there." She said she was not able to see the shooter that night.

On cross-examination, Ms. McClish testified that she did not see anything leading up to the shooting and that she did not know where the victim was before he landed on the ramp. She said that a housekeeper found a gun under the ramp about two weeks after the shooting and that she told him to report it to the district attorney's office. She said she did not look under the ramp after the shooting.

On redirect examination, Ms. McClish testified that she had not seen the gun before the housekeeper found it. She agreed that shootings happened frequently at the Andrew Jackson Homes, that she had moved since this shooting partly for that reason, and that it was common to find shell casings in the area. On recross-examination, Ms. McClish testified that she and others in the neighborhood called the police after they heard the gunshots on June 7, 2008.

Kerry French testified that Ms. McClish was his niece and that he was sleeping at her home on June 7, 2008. He said that he was awakened by several gunshots and that when he looked out the back door, he saw a person lying on the handicapped ramp. He said that he was not a resident of the Andrew Jackson Homes and that he was not familiar with the cut. On cross-examination, Mr. French testified that neither he nor Ms. McClish called the police or 9-1-1.

Mary Jenkins testified that she lived in the Andrew Jackson Homes on June 7, 2008. She said that a lot of people were "hanging out" in the early morning hours on that date, which was typical, but that she slept that night without waking. She identified the Defendant by the nickname of "Ken K." She said she usually saw Ken K helping people wash cars, helping elderly people empty trash, and going to the store. She agreed she saw him around Blank Street also.

Shekiya Grizzard testified that on June 7, 2008, she was on her porch on Sixteenth Avenue and that as she began walking to the kitchen, she heard three or four gunshots. She said that from her porch, she could see the front door near where the shooting happened but that she could not see the location of the shooting. She called 9-1-1 and told the dispatcher someone had been shot. She said that when the dispatcher asked where the victim was, she ran to the victim. She said that the victim's face was stuck between the ramp and the walkway, that his arm was on top of the ramp, that she saw a bullet hole in his back, that she tried to move his face, that she talked to the victim, and that he did not respond. She said that she told the dispatcher she thought the victim was dead, that she moved back from the body, and that the police arrived.

Ms. Grizzard testified that she did not see the shooter and that she had never heard of "Ken K." She said that she was in court because of a subpoena and that she did not want to appear in court. On cross-examination, Ms. Grizzard testified that she called 9-1-1 immediately after she heard the gunshots and made sure her family was safe.

Horace Begley testified that he was subpoenaed to testify. He said that on June 7, 2008, he was standing on his mother's porch on Sixteenth Avenue and that he heard three to four gunshots. He said that he later learned the gunshots came from the cut but that he could not see the cut from his mother's porch. He said the cut was where people stood and did "their business or whatever."

Mr. Begley testified that when he heard the gunshots, he "got down" and that when he stood, he saw four or five people leaving and two cars driving away. He said he walked about halfway to the cut and saw a man lying face-down with his head turned to the left. He returned home and called an ambulance. He said he did not know the victim. He said he was familiar with Ken K from around the Andrew Jackson Homes, and he identified the Defendant as Ken K.

On cross-examination, Mr. Begley testified that the people he saw running away from the cut on the night of the shooting were two men and some women, that the men left in separate cars with a woman driving one of the cars, and that he did not see their faces. He identified a police report he signed that night and agreed he told police the two men were black and twenty to twenty-five years old. He agreed he did not see Ken K that night.

On redirect examination, Mr. Begley testified that this shooting was not the first of which he was aware at the Andrew Jackson Homes. He agreed people usually left quickly after a shooting and said there were two routes by which people could leave the cut. He said he did not see the shooter or see a gun carried by any of the people he saw running.

Metropolitan Police Officer Jack Crouch testified that he responded to a call of shots fired at the Andrew Jackson Homes on June 7, 2008. He said he arrived in a matter of minutes after the call and saw the unresponsive victim lying over a railing. He said that he and other officers cordoned off the area to preserve evidence and that witnesses said they heard shots but did not see anything.

Officer Crouch identified a photograph and testified that it showed the scene as it was when officers arrived, except that emergency medical personnel had treated the victim and removed his shirt before the photograph was taken. He said the cut was between Sixteenth Avenue North and an alley that divided Sixteenth Avenue from Blank Street. He identified a photograph and said that it showed the victim lying with his feet on the cut.

On cross-examination, Officer Crouch testified that he remained at the scene of the shooting until it had been throughly searched for evidence. On redirect examination, Officer Crouch testified that no weapon was recovered from the scene.

Metropolitan Police Sergeant Danny Haley testified that the officers secured the scene according to department policy. Metropolitan Police Sergeant John Bourque testified that he was called to the shooting scene on June 7, 2008, and that he supervised officers preserving the crime scene, collecting evidence, and taking photographs.

Dr. Amy R. McMaster, a forensic pathologist with the Davidson County Medical Examiner's Office, was accepted by the trial court as an expert in the field of forensic pathology. Dr. McMaster performed an autopsy on the victim and determined that he suffered gunshot wounds to his abdomen, chest, and forearm. The bullet to the abdomen entered on the right side and was still in the victim's body at the time of the autopsy. The bullet that entered his chest exited through his back. The bullet to the forearm entered on the outside of the arm and exited from the inside of the arm. She said the order in which she listed the wounds in her report and in testimony was random.

Dr. McMaster testified that gun powder stippling occurred when unburnt gun powder struck the skin, leaving little dots like those made with a sharp pencil tip, and that stippling could indicate how far away the gun was held from the victim. She said that an absence of stippling indicated that the shooter was more than two feet away from the victim or that there was something between the gun and the skin when the gun was fired. In this case, she found no stippling. She said that the gunshot wound to the abdomen injured the victim's liver and that he may or may not have been able to survive that wound with proper treatment. She said the wound to the victim's chest injured both lungs, the aorta, and the spine. This was a fatal wound, and the chances for survival were low.

Dr. McMaster testified that the bullet she collected during the autopsy was kept as evidence at the Medical Examiner's Office and then released to a member of the Nashville Police Department in a sealed condition. A toxicology screen of the victim's blood showed cocaine, cocaine metabolites, and an alcohol level of 0.06. She said the cause of death was multiple gunshot wounds.

On cross-examination, Dr. McMaster identified a diagram she drew of the victim's wounds. She explained that the bullet that entered the abdomen traveled from right to left and back to front. The bullet that entered the chest traveled from front to back, and the bullet that entered the forearm went through the arm. She said it was possible that the bullet that went through the forearm reentered the abdomen or chest, meaning that there were either two or three bullets creating the three wounds. She said that because all the wounds entered from the right side, it was logical that the shooter was at some direction on the victim's right side. She said that "TATTS" written on the diagram indicated the victim's tattoos. She said that because both cocaine metabolites and cocaine were in the victim's system, she roughly estimated that he had ingested cocaine within two hours of his death.

On redirect examination, Dr. McMaster testified that the bullet to the victim's forearm entered on the left, or thumb, side of the arm. She said that the victim could have been holding up his arm when he was shot but that she would not necessarily characterize that wound as defensive.

Metropolitan Police Officer Robert Peterson testified that he had been a police officer for eight years and that he was called to investigate the shooting on June 7, 2008. He canvassed the homes in the area and talked to several individuals, all of whom said they heard the shots but did not see anything. He spoke to Ms. McClish, Mr. French, and Ms. Grizzard. He said that the victim had the name "Boogie" on his belt and that the police used the victim's nickname to identify him as Michael Mayfield.

On cross-examination, Detective Peterson testified that on the night of the shooting, the officers did not know the victim's identity. He agreed that he used police databases to identify the victim through his nickname and mug shots to identify the victim's tattoos.

Stephanie Robertson testified that she saw the victim on June 7, 2008, at Paul's Market on the corner of Eighteenth and Jefferson and that he asked her to give him a ride in exchange for four dollars. She said she took him to a spot behind Mary Pit's Barbeque and to Cheatham Place. She said that she waited at Cheatham Place for five or ten minutes until he came out with another two or three dollars. At his request, she took him to Sixteenth and Blank Streets at the Andrew Jackson Homes, but when he asked her to take him back to the store, she told him no because she was ready to go home. She said that after the victim left

the car, she noticed a friend across the street and went to talk to him for two or three minutes.

Ms. Robertson testified that as she talked to her friend, the victim came back and asked her again to take him to the store. Her friend told the victim to leave her alone, and she walked to her car. She said that as she got into her car, "he" ran toward her and yelled, "wait, wait." She said that she immediately heard about three gunshots and that because her car windows were tinted, all she could see after that was flame from the gun. She said that she saw a body fall but that she did not know who had been shot until a detective came to her house the next day. She said she was hysterical and tried to start the car from the passenger side in case a bullet came through her window. She said that she drove away, stopped at a STOP sign, called 9-1-1, drove back to Paul's Market, put her head on the steering wheel, and cried.

On cross-examination, Ms. Robertson testified that when she drove the victim to a street behind Mary's Pit Barbeque, he said he had to go inside to get four dollars for her. She said that she needed the four dollars for gas and that the victim offered her a couple more dollars to take him to Cheatham Place. She agreed she saw him go into buildings at both of these stops but did not see what he did inside. She said that when she heard the shots, she heard "somebody" coming toward her car but could not see the identity of the shooter or the victim because of her tinted windows. She said she was hysterical and shaking after the shooting. She said that the next day, the police showed her a photograph of the victim and that she identified him as the man to whom she gave a ride.

Ms. Robertson testified that the friend she saw at the Andrew Jackson Homes was someone she knew as Mike and that she told the police his name. She found out later that Mike also went by the nickname "Boom" or "Boon." She said that the police showed her a photograph, from which she identified "Mike." She estimated that her car was about one block from the shooting when it happened and that she was close enough that a bullet could have come through her window.

Metropolitan Police Detective James Arendall testified that he was called to the Andrew Jackson Homes at about 1:30 a.m. on June 7, 2008. He said he canvassed the neighborhood and spoke with brothers Robert and Howard Jones, who were both sitting on a porch in the complex. He said all of the people he interviewed heard gunshots but did not see what happened. He agreed he knocked on some doors where no one answered. On cross-examination, Detective Arendall testified that he conducted all of his questioning in the neighborhood within two hours of the shooting.

Metropolitan Police Officer Warren Fleak testified that he was called to the scene on June 7, 2008, as a crime scene investigator. When he arrived, he took photographs. He

searched for evidence and found two small bags of marijuana, one lying in a grassy area and one in the victim's hand; a nine-millimeter cartridge casing, and a Colt 45 Malt Liquor can, which was found not far from the victim's body. He checked those items for fingerprints and developed a fingerprint from the Colt 45 can. He said that he thought the fingerprint was matched to someone but that he did not remember to whom. He said he searched the entire area thoroughly, including under the ramp, and found no weapons.

Officer Fleak testified that a bullet was found by the victim's left shoulder and that the medical examiner's office collected it. He identified a diagram he drew of the scene and explained that the measurements on the diagram represented the distances between the victim's body and items found at the scene. He identified photographs he took of the scene that night.

On cross-examination, Officer Fleak testified that the bag of marijuana he found in the grass was plainly visible. He said he included both bags of marijuana and the shell casing in the diagram but did not photograph them. He said his camera malfunctioned that night. He said that he found the shell casing in tall grass within a couple of feet of the victim's body and that he searched with a metal detector for more casings in the grass but found none. He identified the report from the fingerprint testing and said the fingerprints on the Colt 45 can belonged to Jessie Lee Coleman. He agreed that when he arrived on the scene, he had no information about where the victim was when he was shot. He agreed the report he completed did not show that he searched under the ramp.

Hope Gardner testified that she lived at the Andrew Jackson Homes in June 2008. She said that she was familiar with the cut and that it was where "everybody hang out, get high, sell drinks and cold drink . . . selling dope." She said she did not know the victim. She said that she knew Ken K from around the neighborhood and that they would say hello.

Ms. Gardner testified that on the night of June 7, 2008, she was going to the Boot Leg House on Sixteenth Avenue to get a cold drink. She said that as she left her home, she entered the cut and saw the victim. She said she saw Ken K on the other side of the street, which she needed to cross. She said that Ken K asked her for some of the cigarette she was smoking but that she put out the cigarette and told him it was too late. She said that after she threw away her cigarette, she walked through the cut with Ken K behind her and that someone yelled her name. She said she felt a push, turned around to say something to Ken K, and saw fire from the first gunshot. She said that she was unable to move during the first and second gunshots but that on hearing the third gunshot, she ran past her home and out a gate. She said that when the victim was shot, he was sitting on the steps with his back turned to Ken K. She said that the victim was talking to David Boone and that it looked like the victim had been "served" in a drug transaction. She said she did not hear the victim or Ken

K say anything to each other. She said she was so scared that she lost control of her bladder when she ran away and that afterward she continued to have nightmares.

Ms. Gardner testified that a couple of weeks after the victim was shot, she spoke with Detective Turbeville and drew a diagram of where people were standing on the night of the shooting. She identified the diagram and used it to show the jury where she, the victim, and Ken K were. She identified the places she marked on her diagram that represented where people were that night and said that one mark represented a man whom she did not know. She said that a spot where she had written "F/B tall skinny" represented where a "female black" was standing whom she did not know. She identified a photograph of the victim lying dead and testified that he was not shot where he was lying but where the steps were. She said that after she ran, she did not look back and did not see what Ken K did. She said that people were talking about stealing the victim's shoes and that she told them not to bother his shoes.

The transcript shows that when Ms. Gardner was asked if Ken K touched her during the incident, she began crying, was difficult to understand, and directed comments toward the Defendant. Later, she testified that after she ran past her apartment, she eventually went back to it and saw that the victim had moved to the ramp. She said that she did not have a phone and that she did not call the police. She said that detectives came to her home and that she did not want to talk to them because she feared for her life. She said the detectives told her that if she did not talk to them, they would return with a warrant. She said they discussed jailing her.

Ms. Gardner testified that she went to the police station and talked to Detectives Turbeville and Stromat. She said the detectives did not tell her who shot the victim. When asked about the two photograph lineups the detectives showed her first, she said, "one of 'em favored him, but, I wasn't sure. I didn't say it was him. . . . I said that dude favored him." She identified a photograph she was shown in the first lineup and said it was the one she told detectives favored the shooter. She said that she told detectives the photograph was not of Ken K and that she said it was different because "he had a medium Afro." She identified the second photograph lineup she was shown and said that she could not identify anyone in that lineup.

Ms. Gardner testified that she wrote the name Ken K on her diagram and that the detectives had not told her the name. She said: "The detective wasn't there when Ken K shot that boy. I was. The detective couldn't tell me nothing. I had to tell them the truth." She said that on the first day she talked to detectives and they showed her photographs, she went home without identifying anyone. She said that when the detectives came back to her home, they had more photographs and that she identified one as Ken K. She said that it took

her about one second to identify the photograph and that she was "ninety-nine, one hundred percent" sure. She identified the person who shot the victim as the Defendant in the courtroom and said that he was Ken K.

Ms. Gardner testified that there was a large streetlight before the cut. When asked if she knew that the Defendant was saying that she made the wrong identification, she said:

> How? I know the man and I was standing right there . . . right here. (Referring to diagram) Right here. That's me, that's him. How can I make a wrong identification? I'm not going to allow nobody putting words in my mouth. I seen what I seen. I was standing here and he could have turned and kissed me in my mouth. That's how close he was at the time of the shooting.

She identified a photograph and said it was of a person named Scar Face. She said that Scar Face did not shoot the victim but that the Defendant did. She identified another photograph and said that she had never seen the person and that it was not the person who shot the victim.

On cross-examination, Ms. Gardner testified that it was about 10:30 that night when she left home and that when she crossed the street to go to the Boot Leg House, she was in front of the Defendant. She used the diagram to show the jury how close she and the Defendant were to each other. She agreed that this testimony was the first time she told anyone she saw the Defendant before the shooting but said she previously testified to his asking her for a cigarette. She said that as she walked through the opening in the fence, she was shoved down and that she knew who shoved her because she knew who was standing beside her.

Ms. Gardner testified that when she said at the preliminary hearing that she did not see the person who shoved her as he approached, she meant that he had to come around her back, that she did not know who he was as he was behind her, but that she knew who had been standing beside her and who shot the gun. She said that when she said in her interview with detectives that she "turned around and cussed out" the Defendant after he pushed her, she meant that she turned to see him at her side. She agreed she heard the shots when she turned to say something to the Defendant. She said she heard three gunshots, and she pointed to a spot on her back to demonstrate where the victim was shot. She said the victim's back was turned when the Defendant shot him three times.

The transcript shows that at this point in Ms. Gardner's testimony, she began crying, asked when she could stop testifying, and said she was tired. When the trial court asked if

she needed to rest, Ms. Gardner asked if she could go to the restroom. With the court's permission, Ms. Gardner left the witness stand in the company of a court officer. When she returned, the trial court inquired about her condition and told defense counsel to resume cross-examination.

Ms. Gardner testified that the three gunshots she heard on that night were close together. She said that she was burned by the first shot, that she saw the flash of the muzzle, and that her ears were ringing. She said that the shooter was alone and that he wore black or blue jeans and a black or blue t-shirt. She said he wore nothing on his head. She said that when she testified at the preliminary hearing that she did not know whether the Defendant wore anything on his head, she was scared and that she had remembered more since the hearing. When asked why she testified at the preliminary hearing that she "knew of" the Defendant, she said that she had seen him in the neighborhood nearly every day. When asked if the Defendant had ever been in her home, she said he had been "before that happened." She denied hearing the name Kenneth Watkins before the shooting.

Ms. Gardner testified that when the police first came to her door, she told them she did not know anything and wanted nothing to do with the case. She agreed that when the police returned later that day, she was scared and assumed they had a warrant. She agreed that she was convicted of facilitation of the sale of less than a half-gram of cocaine in 2000. She agreed that when she was first interviewed by the police at the Criminal Justice Center, she told them that she was not at the scene of the shooting because she was afraid.

Ms. Gardner testified that when she told the police she would take a lie detector test, it was after she told them the truth. She denied that she felt safe when at the Criminal Justice Center, and the transcript reflects that she became upset on the witness stand. She said she did not remember what the detectives told her after she said that a photograph in the first lineup favored the shooter or after she wrote Ken K on the diagram. When asked if she felt like she gave the detectives the answer they were seeking, she said yes and that she told them the truth. She said that after she identified the Defendant in a photograph lineup, she did not talk to the detectives again but that she spoke with someone in the district attorney's office several times.

Ms. Gardner testified that the Defendant had been present in the courtroom at each proceeding at which she testified. She agreed that the first time she spoke to detectives after the shooting was when they came to her home on July 3, 2008. She said she told detectives that the Defendant asked for her cigarette and that she had told the same story each time she testified. When shown the transcript of her testimony at the preliminary hearing, she was not able to find a mention of the cigarette, and she did not recall if she included that in her preliminary hearing testimony.

On redirect examination, Ms. Gardner testified that she identified the Defendant as part of her testimony on two different days of the preliminary hearing. She did not remember if she had testified at a hearing regarding the photograph lineup.

Metropolitan Police Detective William Turbeville testified that he was the lead investigator on this case. He said that he arrived at the scene at about 1:45 a.m. on June 7, 2008, and that other officers were collecting evidence and processing the scene. He said that the victim was at the base of a wheelchair ramp and that a small bag of what appeared to be marijuana was in the victim's hand, with a similar bag nearby on the ground.

Detective Turbeville testified that Sergeant Stromat and he canvassed the neighborhood for witnesses and that they found people who heard the gunshots but none who admitted seeing what happened. He said that they spoke with Horace Begley and that Mr. Begley said he told patrol officers what he knew and did not want to speak further. Detective Turbeville and another officer accompanied the police chaplain to notify the victim's mother, Ms. Elliott, of her son's death and to ask if she had any idea who might have shot him.

Detective Turbeville testified that he attended the victim's autopsy on June 7, 2008, which was performed by Dr. McMaster. He said that an investigator with the Medical Examiner's office was at the scene of the shooting and recovered a bullet that had passed through the victim's body and was inside his clothing. During the autopsy, Dr. McMaster recovered a bullet from the victim's body. Detective Turbeville identified both bullets. He described the procedure followed for sealing the bullets in envelopes, storing them in the police property room, tracking them, and delivering them to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing. He said that the TBI report gave the caliber of the gun that fired the bullets but that the TBI database did not show that the gun had been used in other crimes. No fingerprints were developed on either small bag of marijuana.

Detective Turbeville testified that he returned to Ms. Elliott's home the day after the shooting and spoke to her and her husband to ask if they thought of anything else that would help the investigation. He requested subpoenas for telephone records on numbers the victim used but did not find any connection to the murder. He spoke to the victim's aunt on June 11, 2008, but she was not able to give the police any good investigative leads.

Detective Turbeville testified that he spoke to Stephanie Robertson on June 14, 2008. He said that she had been identified as possibly being in the area of the shooting when it happened and that she said David Boone was a possible witness. He said Mr. Boone stated he did not witness the shooting and had not been at the scene that night. Detective Turbeville identified a photograph of Mr. Boone and said Mr. Boone was born in 1972.

Detective Turbeville testified that he spoke to Mary Jenkins on July 2, 2008, and that she said Hope Gardner was a possible witness. He spoke to Ms. Gardner the next day at her apartment in the Andrew Jackson Homes, which was at street level on the opposite side of the road from where the shooting occurred. He said that Ms. Gardner did not want to talk to detectives at first but that later in the afternoon of July 3, she came with an officer to the Criminal Justice Center. He said that he told Ms. Gardner during the first visit that the police would obtain a material witness warrant if needed but that no such warrant was obtained.

Detective Turbeville testified that Ms. Gardner was reluctant and afraid to talk to the police but that she told them what she saw. He identified the diagram that Ms. Gardner drew and said that the detectives gave her a notepad after she began describing where people were. He said that before Ms. Gardner wrote "Ken K" on the diagram, the only name the police had was "Kincaid" and that the name came from "listening to people talk." He said the detectives did not start using the name Ken K until Ms. Gardner wrote it on the diagram.

Detective Turbeville identified a photograph lineup that he prepared and showed to Ms. Gardner on July 3, 2008. He said she looked at it, pointed to a photograph, and said that it "favored" the shooter, that she had "seen him around," but that the shooter had more of a "fro" hairstyle. He said Sergeant Stromat told Ms. Gardner that the photograph she had chosen was a "filler." He said Ms. Gardner's statement that the photograph favored the shooter was not an identification because a witness had to made a positive identification. He identified a second photograph lineup shown to Ms. Gardner on July 3 and said that he developed it to include an individual that people said might have been in the area. Ms. Gardner did not identify anyone from that lineup, and the police took her home.

Detective Turbeville testified that after Ms. Gardner left, he determined the Defendant's nickname was Ken K. He identified a photograph lineup he prepared in which the Defendant's photograph was the fourth one. He said that on July 7, 2008, he showed this lineup to Ms. Jenkins because he wanted to determine if the Defendant was the person Ms. Jenkins knew as Ken K. He said Ms. Jenkins positively identified Ken K from the photograph.

Detective Turbeville testified that on July 8, 2008, he showed the lineup containing the Defendant's photograph to Ms. Gardner and that she positively identified the Defendant as the shooter almost immediately. He identified a copy of the lineup and said Ms. Gardner circled the Defendant's photograph and wrote her initials by the circle.

Detective Turbeville testified that on July 9, 2008, he spoke to the Defendant at the Criminal Justice Center. He said he read <u>Miranda</u> rights to the Defendant, and he identified a <u>Miranda</u> rights form on which the Defendant had initialed that he understood his rights.

He said the Defendant agreed to answer questions and told them his nickname was Ken K. He said the Defendant told them that he did not shoot the victim and that he "didn't do it in the cut." Detective Turbeville said the police had not told the Defendant where the shooting occurred.

Detective Turbeville testified that a gun was recovered from the scene of the shooting about two weeks after the murder. He said that the gun was found under the ramp on which the victim had been lying and that the gun was not there on the night of the murder. He said the gun found at the scene was a .22 caliber revolver and that the TBI identified the bullets as .38 or .357 caliber. He said that a shell casing was found on the scene on the night of the murder and that a shell casing would usually only be found when a semi-automatic weapon was used, not a revolver. He had the TBI test the .22 caliber revolver for fingerprints, and none were recovered.

Detective Turbeville testified that the police found a beer can at the scene on the night of the murder and that fingerprints on the can were those of Jesse Coleman. He identified a photograph of Mr. Coleman. He said that the name Curtis Wonderly surfaced during the investigation because precinct officers received a tip in which the caller said that Mr. Wonderly was at a Greyhound Bus station saying that he had been involved in a shooting and was leaving town. He identified a photograph of Mr. Wonderly. He identified the Defendant in the courtroom.

On cross-examination, Detective Turbeville testified that the interview with Ms. Gardner at the Criminal Justice Center on July 3, 2008, was recorded. Defense counsel played a seven-minute excerpt of the DVD recording, which Detective Turbeville identified as part of the interview. The jury was also provided with a transcript of the excerpt.

Detective Turbeville identified the first photograph lineup shown to Ms. Gardner, which she examined in the interview portion shown on the DVD excerpt. He testified that the photograph Ms. Gardner talked about was fifth in the lineup and was not the Defendant. He disagreed with defense counsel's statement that Ms. Gardner never said that the photograph favored Ken K but was not Ken K. Detective Turbeville read portions of the transcript, beginning with what the record shows was Sergeant Stromat's answer to Ms. Gardner's question about a nickname:

> Sergeant Stromat: Um-m-m, I don't know. I can't tell you that. I have to ask you if anybody looks familiar.
>
> Ms. Gardner: It – it kind of favors . . . it kind of favors the shooter.

Sergeant Stromat:  It kind of favors him?

Ms. Gardner:  Yeah.

. . .

Sergeant Stromat [in response to Ms. Gardner's explanation of how well she knew "Kinkaid"]:  So – so little.  But, you know him when you see him?

Ms. Gardner:  Yeah.  I told you that picture there, right there, looks familiar.

Sergeant Stromat:  But, that's not Kincaid is it?

Ms. Gardner:  It look . . . I don't know . . . Kincaid hair is short cut now.  It's cut all the way.

Sergeant Stromat:  Yeah.

Ms. Gardner:  He might have long hair then.  But that picture there favor him a lot.

Sergeant Stromat:  But, he's got short hair?

Ms. Gardner:  A Afro be there.

. . .

Sergeant Stromat:  All right.  How well do you know [Kincaid]?

Ms. Gardner:  So – so little.

Sergeant Stromat:  So – so little?

Ms. Gardner:  Um hum.

Sergeant Stromat:  But, if you saw – saw him again, you'd recognize him?  And, you didn't see him in any of those pictures.

-14-

Ms. Gardner:  I think that guy right there . . . favor him.

Sergeant Stromat:  Naw.

Ms. Gardner:  I -- I want . . . wanna say that's him.

Sergeant Stromat:  Short hair cut pictures?

Ms. Gardner:  I didn't . . . Naw he ain't on that, naw.

Sergeant Stromat:  He's not there, not with the short.

Ms. Gardner:  Not that . . . on that picture right there.  This one right here look like him.

Sergeant Stromat:  These?

Ms. Gardner:  Yeah.  He look like that.  This right here look like him.  And, it might be him, but not with hair.  He got an Afro and a got more darker.

. . .

Sergeant Stromat:  I'm gonna be honest with you.

Ms. Gardner:  Um hum.

Sergeant Stromat:  That's what we call kind of a filler picture.
That's just kind of a nobody.

Ms. Gardner:  He . . . he favor that.

Sergeant Stromat:  But, he favors that.

Detective Turbeville agreed that Ms. Gardner did not say that she did not see the shooter in the lineup.

Detective Turbeville testified that when Ms. Gardner wrote "Ken K" on a notepad, Detective Stromat said, "There we go."  He agreed that Ms. Gardner asked if that was the nickname they were given and that Detective Stromat told her it was the nickname they had.

-15-

He agreed Ms. Gardner did not say during the interview that she had spoken to Ken K several times or that Ken K had been in her home. He said that the first time he heard what he thought was "Kinkaid" but was "Ken K" was from Ms. Jenkins and that she said Ms. Gardner told her Ken K was the shooter. He said Ms. Jenkins told him "people" were saying that Ken K was the shooter but agreed she gave the police no names other than Ms. Gardner's.

Detective Turbeville testified that he and Sergeant Stromat returned to Ms. Gardner's home a second time on July 3, 2008, to ask if she would go to the Criminal Justice Center for an interview. She was accompanied by another officer to the Criminal Justice Center. He said that when they spoke to Ms. Gardner at her home the second time on July 3, they told her that if she did not cooperate, it was possible that they would obtain a material witness bond or that she could be arrested. He said he had not spoken to the district attorney about Ms. Gardner.

Detective Turbeville testified that Ms. Gardner was "angry, scared, hesitant, reluctant" when she arrived for the July 3, 2008 interview. He agreed that she first said she had not been at the murder scene and did not know the shooter or the victim. He said she told them she would take a lie detector test after she told them she had not been there and before she viewed the lineup. He agreed she did not make a statement about a lie detector test after she viewed the lineup. He agreed that Sergeant Stromat told the victim before showing her the lineup that he knew the name of the person who fired the shot and that he was going to show Ms. Gardner some pictures. He said Ms. Gardner said, "show me a picture."

Detective Turbeville testified that he had worked in law enforcement for twenty-four years and had been a detective for five years. He agreed he did not write in his interview report that Ms. Gardner said a photograph in the first lineup favored the shooter. He said he did not refer to the interview recording in his written report because it was noted in his property and evidence report of the DVD. He acknowledged there was no recording of Ms. Gardner's identification of the Defendant's photograph from the lineup shown to her at her home, and he explained he only had the technical capability to record an interview at the Criminal Justice Center. He said her identification of the Defendant was recorded on a supplemental report, on the color copy of the photograph lineup where Ms. Gardner circled the Defendant's photograph and initialed it, and on the photograph identification form she completed and signed. He acknowledged that the interview rooms at the Criminal Justice Center were open on the day he and Sergeant Stromat went to Ms. Gardner's home to show her the lineup containing the Defendant's photograph.

Detective Turbeville testified that he included a photograph of Alrenzo Pullens in the first lineup he and Sergeant Stromat showed Ms. Gardner on July 3, 2008, because they had

information that Mr. Pullens might have been present at the shooting. He said they never spoke to Mr. Pullens.

Detective Turbeville testified that he searched the victim's wallet and a pocket on the night of the murder and that he found a piece of paper with a phone number and a name "something like . . . Big Sexy" written on it. He said the victim was wearing a belt with "Boogie" written on it, which the police later learned was the victim's nickname.

Detective Turbeville testified that the fingerprints tested on the beer can that was found near the victim's body were identified as belonging to Jesse Coleman. He said a photograph of Mr. Coleman showed him to be probably in his forties, African-American, with a small "Afro" and a deep bag or scar under one eye. He identified a photograph of Mr. Coleman. He said he never spoke to Mr. Coleman or included him in a lineup.

Detective Turbeville testified that when he spoke to Horace Begley a few hours after the shooting, Mr. Begley said he saw two African-American men, who appeared to be in their twenties, running away from the cut soon after the shots were fired. He agreed he told dispatch on his radio that officers should watch for those men and also for a female individual whom Mr. Begley said he saw leaving the scene. He agreed he did not speak to Mr. Begley again and did not show him the Defendant's photograph. He said that when he interviewed Stephanie Robertson and learned she had been near the scene of the shooting and talking to Mr. Boone, he realized Ms. Robertson was the woman Mr. Begley saw leaving the scene. He said interviews with those who were present that night confirmed that many people ran from the scene when they heard the shots.

Detective Turbeville identified the .22 caliber revolver found under the ramp at the scene of the shooting two weeks after the murder. He agreed that although testing determined that the gun could not have been the one used to shoot the victim, he had no way of knowing the last time the gun was fired.

Detective Turbeville testified that he had seen the Department of Justice guidelines for conducting a photograph lineup and that they were similar to the Metropolitan Police Department's guidelines. He agreed that before viewing a lineup, a witness should be instructed that it is as important to clear the innocent as to identify the guilty, that the individuals in the lineup may not appear exactly as they did on the incident date, and that the person who committed the offense may not appear in the lineup. He denied he had not given those instructions to Ms. Gardner and said he gave similar instructions each time he showed someone a lineup. He agreed he did not record giving these instructions in his report and said that was because he routinely gave the instructions. He said he remembered telling Ms. Gardner: "Take your time, keep in mind that people's features change . . . and look at the

lineup." He agreed the recording of the July 3, 2008 interview in which Ms. Gardner viewed two lineups showed he did not give these instructions to her during that interview. He said he was aware of a Metropolitan Police Department form entitled "Advice to Witness Viewing Photographic Lineup Display" and agreed he did not use the form when interviewing Ms. Gardner.

Detective Turbeville agreed that when showing a lineup, the officer should avoid saying anything to make the witness focus on one photograph. He denied it was a problem to tell a witness who said a photograph favored the person that the photograph was a "filler." He said it would be inappropriate to tell a witness that the lineup contained filler photographs before the witness viewed the lineup but said an explanation of the source of photographs in answer to the witness's questions was acceptable after the witness had viewed the lineup. He said that when Sergeant Stromat told Ms. Gardner that a photograph was a filler, although she had said the photograph favored the shooter, she had viewed that lineup without making an identification.

Detective Turbeville testified that on July 3, 2008, he and Sergeant Stromat spoke to Ms. Gardner for about twenty minutes at her home and about an hour to an hour and twenty minutes total during the day, including the interview at the Criminal Justice Center. He said that during those interviews, Ms. Gardner did not mention the Defendant's asking for her cigarette. He agreed Ms. Gardner did not tell detectives that she saw the Defendant before the shooting that night or that the Defendant had once been in her home.

Detective Turbeville testified that he read the Defendant his Miranda rights after telling him that he was in custody for the homicide investigation into the murder of the victim. He agreed that the Defendant said he knew the victim had been killed and that the Defendant claimed he had nothing to do with the murder.

On redirect examination, Detective Turbeville testified that he obtained a subpoena for the phone number he found in the victim's pocket and that the number was traced to Altonja Fuqua. He said that a detective spoke with Ms. Fuqua and that Ms. Fuqua knew the victim but could offer no pertinent information.

Detective Turbeville testified that the Defendant's date of birth was December 19, 1960. He said that the July 3, 2008 interview recording showed Ms. Gardner identifying a photograph of David Boone in the folder and saying that Mr. Boone was present on the night of the shooting. He said that in the recording, when Ms. Gardner wrote something, walked away, and came back, she had written "Ken K." He said Ms. Gardner told the police she saw three gunshot "holes" in the victim. He agreed the entire recording of the interview with Ms. Gardner at the Criminal Justice Center was about thirty minutes long. He said that Ms.

Gardner explained why she had not been forthcoming with information at first and that it was not because she was afraid of being arrested. He read some of Ms. Gardner's words from the interview transcript, including the following:

> It's best to be quiet, don't say nothing when you see it or you don't see it. That's the best – that's the only way you can survive in the projects. You don't understand cause you don't live there. You ain't got to sleep there, you ain't got to worry.

Detective Turbeville testified that a witness would only be asked to sign the photograph lineup form if she had identified someone. He said Ms. Gardner did not sign the forms for the two lineups she viewed on July 3, 2008, because she did not make an identification on that day. He identified the photograph lineup form completed and signed by Ms. Gardner when she identified the Defendant on July 8, 2008.

Agent Tommy M. Heflin testified that he had worked at the TBI Forensic Services Crime Laboratory for thirty-five years and that he specialized in firearms identification. He said that a bullet picked up a reverse image of the striations in the barrel of an individual gun and that by studying that image on the bullet, he could determine the gun used to fire it. He could also determine the particular gun that fired a shot by examining the firing pin impression on a fired cartridge casing. He explained the difference between a revolver and a semi-automatic handgun.

Agent Heflin identified the two bullets taken from the victim and said he examined them. He determined that the first bullet was a .38 or .357 caliber, semi-jacketed, hollow-point bullet, which was normally loaded in cartridges manufactured by Winchester. He said that the second bullet was also a .38 or .357 caliber, semi-jacketed, hollow-point bullet but that it had a different design, known as a Federal manufactured Tiger shot brand. He determined that the bullets were shot through the same gun barrel, that the gun was either a .38 or .357 caliber revolver, and that the revolver was manufactured by Smith and Wesson, Taurus, or Llama.

Agent Heflin testified that a bullet from a .38 or .357 caliber revolver could not be shot through a .22 caliber gun. He reviewed a photograph of the gun found at the scene of the shooting two weeks after the murder and said the gun could not have shot the bullets he tested. He said that revolvers do not eject cartridge casings on their own, that Winchester and Federal load the type of bullets he tested into revolver ammunition, but that it was possible for a person to reload the cartridge case into a nine-millimeter cartridge.

On cross-examination, Agent Heflin testified that the three brands of revolver he specified would be the most likely manufacturers of the revolver used in the shooting but that his report listed "possibly other" brands because there could be others. He did not receive any firearms for testing in this case.

The Defendant waived his right to testify. The jury convicted the Defendant of premeditated first degree murder, and the trial court sentenced him to life in prison. This appeal followed.

## I

The Defendant contends that the evidence was insufficient to support the conviction because the State failed to establish the identity of the shooter and to prove the element of premeditation. He argues that if the identification of the Defendant as the shooter is upheld, the conviction should be modified to second degree murder. The State contends that the evidence was sufficient to support the conviction for premeditated first degree murder. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

First degree murder is an unlawful, premeditated, and intentional killing. T.C.A. § 39-13-202(a)(1). "Premeditation" is defined as an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. Id. at 202(d).

> It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "A jury is not limited to any specific evidence when determining whether a defendant intentionally killed the victim 'after the exercise of reflection and judgment.'" State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003) (quoting T.C.A. § 39-13-202(d)). Premeditation may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. "'Intentional' means that a person acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." T.C.A. § 39-11-106(a)(18) (2010).

In the light most favorable to the State, the proof shows that the Defendant approached the victim from behind and shot him two or three times, killing the victim within moments. Ms. Gardner testified that she knew the Defendant and recognized him before the shooting. According to her testimony, she saw the victim sitting with his back turned; she was shoved down; she knew the Defendant was then beside her; she heard and saw the gun fire beside her twice; she saw the wound in the victim's back, and she ran when she heard the third gunshot. She said that the victim was talking to Mr. Boone immediately before the Defendant opened fire and that she heard no words exchanged between the Defendant and the victim.

The Defendant questions the accuracy of Ms. Gardner's observations and notes that Dr. McMaster testified that bullets entered the victim's body at his chest, abdomen, and right forearm. Dr. McMaster, however, also testified that the bullet that entered the victim's chest exited his back, and Ms. Grizzard testified that she saw a "bullet hole" in the victim's back. We note that a rational trier of fact reasonably could have believed that the exit wound was the "hole" Ms. Gardner and Ms. Grizzard saw in the victim's back. Dr. McMaster said that the victim's wounds were consistent with the shooter being on the victim's right side, which was consistent with where Ms. Gardner, on her diagram, noted the Defendant's location as he came through the opening in the fence. Ms. Gardner did not claim to see, and the record does not show, whether the victim turned toward the Defendant as the Defendant began to fire.

The Defendant argues that the proof in this case established none of the factors that would demonstrate premeditation. Our supreme court has noted the following factors that demonstrate the existence of premeditation: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the Defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness after the killing." Bland, 958 S.W.2d at 660.

The Defendant acknowledges that in the light most favorable to the State, the proof shows that the Defendant used a deadly weapon, shot the victim two or three times, failed to call the police, left the scene of the shooting, and failed to surrender voluntarily to police.

-21-

The Defendant notes that each of these circumstances, taken alone, may not establish premeditation. See, e.g., State v. Tune, 872 S.W.2d 922, 925 (Tenn. Crim. App. 1993) (noting that "willful killing with a deadly weapon is not sufficient by itself to support an inference of premeditation" but holding that the combination of circumstances in the case did support premeditation) (emphasis added). The Defendant cites State v. Brown for his premise that multiple gunshots do not establish premeditation. See 836 S.W.2d 530, 543 (Tenn. 1992) (reversing first degree murder conviction when "repeated blows" were the only evidence offered of premeditation). Our supreme court has since held, however, that a defendant's "conscious choice" to shoot a victim repeatedly after disabling him contributed to evidence of premeditation. See Bland, 958 S.W.2d at 660.

In this case, the State's proof also showed that the victim was unarmed, that the Defendant and victim were not engaged in an altercation or conversation immediately before the shooting, that the Defendant entered the area where the victim was sitting with his back to the Defendant, and that the Defendant shoved Ms. Gardner out of the way to fire his gun at the victim. We conclude that a rational trier of fact could have found beyond a reasonable doubt that the Defendant killed the victim intentionally and with premeditation.

## II

The Defendant contends that the trial court erred by denying his motion to suppress Ms. Gardner's out-of-court and in-court identifications of him. He argues that his right to due process was violated because the pretrial lineup procedure was unduly suggestive and because Ms. Gardner's subsequent identification testimony at the trial was unreliable. The State contends that the trial court correctly determined that the lineup procedure was not unduly suggestive and that Ms. Gardner's identification testimony was reliable. We agree with the State.

At the hearing on the motion to suppress identification, Detective Turbeville testified to essentially the same facts as he did at the trial regarding the interviews with Ms. Gardner, her initial denial that she was present at the murder scene, her subsequent statement that she was standing within feet of the shooter during the shooting, and her identification of the Defendant. He also testified that after Ms. Gardner wrote Ken K on her diagram, he connected the nickname to the Defendant by searching a police nickname database.

On cross-examination, Detective Turbeville testified that on the morning of July 3, 2008, Sergeant Stromat and he told Ms. Gardner they would have to obtain a material witness warrant for her if she would not talk to them and that after she told them about Ken K,

Sergeant Stromat told her that because she told the truth, they would withdraw the warrant. He said the information he received that Ms. Gardner was at the scene of the shooting came from Ms. Jenkins and also "a person just walking by saying the same thing." He agreed he called to have the police database searched for Ken K while he was in the room with Ms. Gardner during the July 3 interview. He denied he was confirming the shooter's identity for Ms. Gardner and said that at the time, he did not know that the Defendant was Ken K. He said that he and Sergeant Stromat did not have any contact with Ms. Gardner between the July 3 and July 8 interviews and that they did not call her in advance on July 8. He said the database search for Ken K yielded two or three people in addition to the Defendant. He said Mr. Pullens's nickname was not Ken K.

On redirect examination, Detective Turbeville testified that the purpose of showing Ms. Gardner the first two photograph lineups on July 3, 2008, was to determine who might have been involved in the shooting either as a suspect or as a witness. He agreed that if he or Sergeant Stromat had told Ms. Gardner during an interview that they knew the identity of the shooter, it would not have been a true statement.

Hope Gardner testified that she did not want to be in court, that she was scared, and that the situation was never going to be better for her. She said she told the police the truth and asked why she still had to appear in court. She identified the diagram she drew and said she wrote Ken K on it. She said no one told her the name or told her to write it on the diagram. She said the police came back to her home and showed her pictures a couple of days after her first interviews with them. She identified the photograph lineup shown to her on July 8, 2008, and said that when she looked at the lineup, she knew who Ken K was and that he was the shooter. She said she was beside the shooter and about two feet away from him during the shooting. She said that no one told her the shooter's name and that she already knew him as Ken K.

On cross-examination, Ms. Gardner testified that she was walking by herself on the night of the murder. She said that she was walking through the cut and that as she got beyond it, the Defendant came through the cut and around her. She said that she was pushed to the ground, that she turned around to say something to the Defendant, that she heard gunfire, that she tried to run and could not, that "he shot him again," and that she still could not run. She said that the Defendant "shot that boy in his back" and that she saw the hole in the victim's back. She said that the Defendant fired a third shot and that she was able to get up and run between the second and third shots. She said that the shots were fired close together and that she believed there were three shots but that there could have been more.

Ms. Gardner testified that she knew of the Defendant from around the neighborhood and that she had spoken to him before. She said that two or three days after the shooting, she

saw him when she emptied her trash. She agreed that she did not call the police after the shooting and that the first time she spoke to the police was when they came to her home on July 3, 2008. She said that she told the police she did not want any part in the investigation and that the police told her they were going to get a warrant and take her into custody. She said she thought the police were going to arrest her when they returned to her home later on July 3.

Ms. Gardner testified that during the interview at the police station on July 3, 2008, she chose a photograph from a lineup and told the police that "this guy favor" the shooter. She said she was not sure because the man in the photograph had an "Afro." She said that when the police showed her the photographs on July 8, she picked out a photograph and said it was Ken K. She said no one told her to pick Ken K. She said: "I know Ken K. I can close my eyes and I see Ken K. I am telling you the truth." She agreed that the police told her the photograph she said favored the shooter was a filler and that after she wrote Ken K on the diagram, the officers told her it was the name they had heard from others.

The trial court took the matter under advisement and viewed the recording of Ms. Gardner's July 3, 2008 interview at the Criminal Justice Center. In a written order denying the motion to suppress, the court stated:

> The Court finds that Ms. Gardner was brought to the police station on July 3, 2008, and was convinced by detectives that she should cooperate with them. The Court finds that she cooperated and was able to confidently identify the street name of the individual who shot the victim. The Court finds that she observed several photographs and commented on the fact that one picture "favored" the shooter without ever confirming that she thought this was the shooter. The Court finds that she asked the detectives if they had been given the name "Ken K" by other witnesses and that Sergeant Stromat confirmed that this name had been mentioned by a witness. The Court finds that the detectives told her that the picture she said favored the shooter could not have been the shooter. The Court finds that before Ms. Gardner left the station she was shown several other lineup photographs on the computer without any positive identification. The Court finds that on July [8], 2008, the detectives came to Ms. Gardner's home and showed her another set of photographs and that she was able to correctly identify the shooter quickly and with confidence.

-24-

The Court accredits the testimony of Detective Turbeville and finds that the photographic lineup was created in a manner which is not "unnecessarily or impermissibly suggestive["] under Biggs and Biggers. The Court finds that Ms. Gardner was shown a number of photographs and that Sergeant Stromat told her before her identification that police had an idea about a possible nickname of the shooter. The Court finds that showing her a lineup before or after imparting the knowledge of the shooter's nickname does not make the lineup unnecessarily suggestive.

The Court also finds that the identification itself was reliable. The Court finds that even though the homicide occurred at night, Ms. Gardner was within a few feet of the shooter when he shot the victim. More importantly, the Court finds that Ms. Gardner knew the shooter, even if she only knew his nickname and knew him in passing. The Court therefore finds, based on a totality of the circumstances, that there can be no doubt that Ms. Gardner's identification of the Defendant is a reliable identification.

A trial court's factual findings in a motion to suppress hearing are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Furthermore, questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The application of the law to the facts as determined by the trial court is a question of law that is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

In Simmons v. United States, 390 U.S. 377 (1968), the United States Supreme Court discussed the hazards of an identification procedure involving photographs as opposed to a lineup. However, the Court also recognized the use of photographs as an effective procedure "from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." Id. at 384. It concluded that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Id.; see, e.g., Sloan v. State, 584 S.W.2d 461 (Tenn. Crim. App. 1978). The Court in Simmons noted that the potential

for misidentification is increased when one photograph is "in some way emphasized" or "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." 390 U.S. at 383 (footnote omitted). Thus, "a photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law.'" State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting Stovall v. Denno, 388 U.S. 293, 301-02 (1967)).

In this case, the Defendant first argues that the lineup process was unnecessarily suggestive because the police told Ms. Gardner in the July 3, 2008 interview that the person she said "favored" the shooter was a filler. The State responds that Ms. Gardner's only positive identification was of the Defendant on July 8, 2008. Upon review of the DVD excerpt of the July 3 interview and the record of Ms. Gardner's testimony at the suppression hearing, we conclude that the evidence does not preponderate against the trial court's finding that Ms. Gardner did not identify the photograph she said favored the shooter as the shooter. The recording shows that after Sergeant Stromat told Ms. Gardner the photograph was a filler, she repeated that the photograph favored the shooter, which supports the trial court's interpretation that she was saying the photograph looked similar to the shooter. In contrast, Ms. Gardner and Detective Turbeville both testified that Ms. Gardner's identification of the Defendant was positive and nearly immediate when she saw the lineup containing his photograph five days after the July 3 interview.

The Defendant further argues that the lineup was unnecessarily suggestive because when Ms. Gardner wrote Ken K on her diagram, the officers confirmed that Ken K was the name they had obtained from other people. The Defendant reasons that after this confirmation, Ms. Gardner was ready to identify Ken K as the shooter as soon as she saw a photograph of the person she knew by that nickname. The State responds that the officers did not tell Ms. Gardner which photograph to identify. We recognize that Ms. Gardner's confidence in her identification of the person she knew as Ken K may have been strengthened before the July 8, 2008 lineup by the officers' confirmation of the nickname on July 3. See, e.g., State v. Scarborough, 300 S.W.3d 717, 729 (Tenn. Crim. App. 2009) (noting that a photograph lineup may have been suggestive because an officer told the victim that there was a DNA match in possibly related cases).

After reviewing the totality of the circumstances, though, we conclude that the trial court did not err by finding that the officers' confirmation of the nickname did not make the July 8, 2008 lineup unnecessarily suggestive. The record shows that Ms. Gardner wrote Ken K on her diagram on July 3 before the officers confirmed the nickname. Moreover, Ms. Gardner clarified for the officers what they had heard as "Kincaid," and Detective Turbeville testified that he was able to trace the nickname to the Defendant only after Ms. Gardner

provided this clarification. Ms. Gardner testified that as soon as she saw the lineup on July 8, she identified the Defendant as the shooter. The record does not support a conclusion that the officers' confirmation of the nickname gave rise to the likelihood of an irreparable mistaken identification.

Even if the identification procedure were unnecessarily suggestive, however, suppression of either an out-of-court or in-court identification is only required when the totality of the circumstances shows that the identification was unreliable. See Neil v. Biggers, 409 U.S. 188, 198-99 (1972); State v. Biggs, 211 S.W.3d 744, 749 (Tenn. Crim. App. 2006). In Biggers, the United States Supreme Court set forth five factors to be considered when determining whether an identification is reliable and thus admissible: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. Biggers, 409 U.S. at 199-200. The court must consider the "totality of the circumstances" in determining whether the identification was reliable. Id. at 199.

The Defendant argues that a review of the Biggers factors supports a conclusion that Ms. Gardner's pretrial photograph identification and subsequent identification testimony of him were unreliable. We disagree. First, he argues that Ms. Gardner's opportunity to view the shooter was minimal because it was dark and because she was shoved down before the shooting. As the trial court noted, Ms. Gardner had an opportunity to view the shooter despite the darkness and the suddenness of the incident because she was within a few feet of the shooter and because she recognized him well enough to identify him quickly. Ms. Gardner testified that she saw the Defendant before they walked through the "cut" and that she knew he was the one who had shoved her and was beside her before he began firing the gun. We note that the record also shows a large streetlight near the area of the shooting.

Second, the Defendant argues that Ms. Gardner's attention was on the gun rather than the shooter and that her degree of attention was lessened by her fright and instinct for self-preservation. Ms. Gardner testified that she saw the "fire" from the gun and that it burned her arm. She said she could not run until after she heard the second gunshot and saw a hole in the victim's back. Her testimony left no doubt that she was frightened for her life during the shooting, but she also testified that she knew the Defendant was beside her before he began firing the gun.

Third, the Defendant argues that the accuracy of Ms. Gardner's previous description was undermined by her testimony that the victim was shot in the back, Mr. Begley's report to the police that two African-American men about twenty years younger than the Defendant

were running from the scene, and the fact that she was not asked to provide a description before the lineup. As we have noted, Dr. McMaster testified that the fatal bullet that entered the victim's chest had exited his back, and a rational trier of fact could have found that the exit wound was the "hole" Ms. Gardner saw in the victim's back. Mr. Begley testified that he saw two African-American men in their twenties running from the scene, but he also testified that he saw four or five people running, that there was another exit route from the cut, and that people usually fled quickly when a shooting occurred.

As for a physical description before the photograph lineup identification, the Defendant correctly notes that one did not exist because the police did not ask Ms. Gardner to provide a description after she provided the shooter's nickname. The Defendant cites cases as examples in which the witnesses provided the police with a detailed physical description of a suspect or suspects who were unknown to them before witnessing the crime. See, e.g., Sloan, 584 S.W.2d at 463 (noting that two hotel front office workers gave the police "fairly complete descriptions" of two men who robbed the hotel). In contrast, the circumstances in this case were unusual in that Ms. Gardner provided the shooter's nickname, but the police needed to verify that name through photograph identification because it was shared by two other individuals in the nickname database. Detective Turbeville testified that he linked the nickname to the Defendant through the database, which prompted him to place the Defendant's photograph in the lineup. Before showing the lineup to Ms. Gardner, Detective Turbeville showed the lineup to Ms. Jenkins to confirm that the Defendant was the Ken K she knew from the Andrew Jackson Homes neighborhood. Although the police did not have a physical description of the Defendant, the name provided by Ms. Gardner gave officers a valid basis for including the Defendant's photograph in the lineup.

Fourth, although the Defendant concedes that Ms. Gardner was certain of her identification, he argues that her certainty was undermined by the suggestiveness of the lineup and her natural reluctance as a witness to retract an identification. We conclude that the trial court did not err by finding the identification procedure not to be unnecessarily suggestive. We decline to speculate that Ms. Gardner, a reluctant witness, did not change her identification testimony only because she was hesitant to make a retraction.

For the final factor, the Defendant argues that the time that elapsed between the murder on June 7, 2008, and Ms. Gardner's identification of the Defendant thirty-one days later on July 8 weighed against reliability. The Defendant cites cases for comparison in which the span of a week or less between the offense and the witness's identification was a positive factor for reliability. See, e.g., Wadley v.State, 634 S.W.2d 658, 662-63 (Tenn. Crim. App. 1982) (noting that the short time of seven days between the crime and the identification combined with other circumstances to make the witness's in-court

identification of the defendant reliable despite an improper show-up identification before the trial). In Biggers, the Supreme Court noted that the seven-month time span between the offense and the identification in the case "would be a seriously negative factor in most cases" but held that the identification was reliable upon consideration of the totality of the circumstances. See 409 U.S. at 201; see also Scarborough, 300 S.W.3d at 730 (upholding reliability of identification despite a five-year time span between the offense and the identification). Within this spectrum, the month-long span in this case is a slightly negative factor against reliability. Upon consideration of the totality of the circumstances and the Biggers factors, we conclude that the photograph identification of the Defendant was sufficiently reliable and that the trial court did not err by denying the Defendant's motion to suppress the identification. See, e.g., State v. Robert Lamont Moss, Jr., No. M2006-00890-CCA-R3-CD, Davidson County, slip op. at 4 (Tenn. Crim. App. Dec. 4, 2007) (holding that the totality of the circumstances, including a one-month span between the offense and the identification, supported the reliability of the witness's positive identification of the defendant), app. denied (Tenn. Apr. 7, 2008).

**III**

The Defendant contends that the trial court erred by denying his motion to exclude Ms. Jenkins's testimony and by allowing Ms. Jenkins and Mr. Begley to testify regarding the Defendant's nickname. He argues that these witnesses did not have personal knowledge of the murder and that their knowledge of the Defendant's nickname was irrelevant. The State argues that the trial court correctly ruled that the evidence was relevant and did not abuse its discretion by admitting the testimony. We agree with the State.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Our supreme court has defined unfair prejudice as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Mitchell, 339 S.W.3d 629, ___, slip op. at 8 (Tenn. 2011) (quoting State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978)). "Rule 403 decisions fall within the discretionary authority of the trial court and will not be overturned absent an abuse of discretion." Mitchell, 339 S.W.3d at ___, slip op. at 8.

In denying the Defendant's motion for new trial, the trial court stated regarding this issue:

The Court finds that Ms. Gardner's identification revolved largely around the Defendant's nickname. The Court finds that the proof at trial showed that Ms. Gardner was familiar with Ken K from numerous encounters with him in the neighborhood where she lived and that Ken K was the person she had seen shoot the victim. The Court finds that corroborating testimony by other witnesses that Ken K was indeed his street name was relevant to establishing his identity in addition to Ms. Gardner's statement, photographic lineup identification, and in-court identification.

Detective Turbeville testified that Ms. Jenkins gave him Ms. Gardner's name as a possible witness to the shooting and that he first heard the nickname he thought was "Kincaid" from Ms. Jenkins. Ms. Gardner's identification of Ken K on the diagram she drew during her interview at the Criminal Justice Center sent Detective Turbeville back to the police nickname database, and his database search linked the nickname to the Defendant. Detective Turbeville said that because of this information, he included the Defendant's photograph in the lineup that led to Ms. Gardner's identification of the Defendant. Ms. Gardner testified that she knew the Defendant by his nickname from around the neighborhood but that she had never heard his given name. Mr. Begley and Ms. Jenkins both identified the Defendant as the person they knew as Ken K from the same neighborhood where Ms. Gardner knew him and where the shooting occurred. We conclude that the testimony regarding the Defendant's nickname was relevant to Ms. Gardner's identification of him as the shooter. See, e.g., State v. Aubrey Tremaine Eisom & Cedric Moses, No. W2009-02098-CCA-R3-CD, Dyer County, slip op. at 20 (Tenn. Crim. App. Nov. 5, 2010) (considering witnesses' testimony regarding the defendant's nickname to be corroborative of an eyewitness's identification of the defendant by his nickname), app. denied (Tenn. Mar. 9, 2011).

The Defendant argues that if the testimony regarding his nickname were relevant, the trial court still erred by allowing it because the testimony was unfairly prejudicial and needlessly bolstered Ms. Gardner's identification. He argues that the danger of unfair prejudice was that the jury would view establishment of the nickname as establishment of the Defendant's guilt, in other words, that to prove he was Ken K was in the jury's view to prove he murdered the victim. He cites State v. Zirkle, in which this court stated that trial courts should "closely monitor any misuse" of nicknames. See 910 S.W.2d 874, 886 (Tenn. Crim. App. 1995). In Zirkle, this court held that evidence of the defendant's nickname was relevant to his guilt or innocence and that pursuant to Tennessee Rule of Evidence 403, the testimony regarding the nickname was admissible. See id.

We agree with the Defendant that when the jury credited Ms. Gardner's testimony regarding the shooter's identity, as their verdict shows they did, other witnesses' testimony that the Defendant was Ken K helped to establish his guilt. This is precisely why the witnesses' corroborative testimony was relevant. See Tenn. R. Evid. 401. We do not agree, however, that the testimony was unfairly prejudicial or suggested a decision on an improper basis. Ms. Jenkins testified that she often saw the Defendant around the neighborhood helping people wash their cars and helping elderly people empty their trash. Mr. Begley testified that he did not see Ken K on the night of the shooting. Neither witness offered negative information about the Defendant or his criminal history, associations, or activities. We conclude that the trial court did not abuse its discretion by denying the motion to exclude Ms. Jenkins's testimony or by allowing witnesses to testify about the Defendant's nickname because the probative value of the testimony substantially outweighed any danger of unfair prejudice.

## IV

The Defendant contends that the trial court erred by allowing the prosecutor to elicit testimony regarding threats against a witness and witnesses' fears of reprisal. He argues that this testimony improperly implied that the Defendant was involved in other crimes, wrongs, or acts in violation of Tennessee Rule of Evidence 404(b), and he requests a new trial due to prosecutorial misconduct. The State argues that the trial court stopped any testimony regarding threats and acted within its discretion in allowing testimony regarding the witnesses' fears surrounding the shooting. We agree with the State.

Initially, the State contends that the Defendant waived this issue because he did not request a curative instruction at the trial. See T.R.A.P. 36(a) (stating that an appellate court is not required to grant relief to a party who failed to take action to nullify a harmful error). The Defendant, however, filed a pretrial motion requesting that the trial court prevent witnesses from testifying that they feared reprisal or had received threats not to testify and that Ms. Gardner not be allowed to testify regarding an unsigned, threatening note she received. At the pretrial motion hearing, the State agreed that it would not ask Ms. Gardner about the note. The trial court ruled that evidence of a threatening note was inadmissible. The record also shows that defense counsel objected when the prosecutor asked witnesses questions regarding neighborhood pressures to stay silent. We conclude that the Defendant did not waive this issue.

Tennessee Rule of Evidence 404(b) prohibits evidence of other crimes, wrongs, or acts offered to show a character trait in order to prove that a defendant acted in conformity with that character trait. However, evidence of other crimes, wrongs, or acts may be admissible for other purposes. Id. We review a trial court's ruling on evidentiary matters under Rule 404(b) using an abuse of discretion standard, provided the trial court has substantially complied with the procedural prerequisites of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Prosecutorial misconduct does not constitute reversible error unless the outcome was affected to the defendant's prejudice. See State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001); Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976) (setting out considerations for determining if the prosecutor's conduct could have improperly prejudiced the defendant and affected the verdict).

We first address the Defendant's claim as it relates to Ms. Gardner's testimony. At the pretrial motion hearing, the trial court said it would allow testimony regarding Ms. Gardner's fear during the shooting, and defense counsel responded, "[T]hat we're not disputing. We were thinking more in terms of retribution which are other acts, somebody sent me a note . . . ." During direct examination, the following exchange occurred when Ms. Gardner was describing her state of mind during the shooting:

> Prosecutor: You were so scared you peed in your pants.
>
> Ms. Gardner: Yeah. I had nightmares, dreams. People was (Indiscernible). People put things in my mailbox.
>
> Prosecutor: Now, after you heard the first [gunshot] --
>
> Ms. Gardner: Ma'am?
>
> Prosecutor: Take a minute if you need . . . okay?
>
> Trial Court: Would you like a glass of water?

The transcript shows that there was a pause in the proceedings at this point and that when direct examination resumed, the prosecutor asked Ms. Gardner to explain her diagram of the shooting. Defense counsel did not object before or after Ms. Gardner said, "People put things in my mailbox."

The Defendant raises two incidents during defense counsel's cross-examination of Ms. Gardner in which he claims that the witness's unsolicited statements about threats violated Rule 404(b). First, in answer to defense counsel's question about whether she was

sick after the shooting, Ms. Gardner testified: "[T]hat whole week I thought I was losing my mind. I got sick. I began to lose hair, everything just -- cause I had -- scared me . . . get letters in my mailbox what they gonna do to me." The trial court interrupted Ms. Gardner, and defense counsel redirected her. Second, when defense counsel asked Ms. Gardner if at the beginning of her Criminal Justice Center interview, she continued to claim she had not been at the scene of the shooting, the following exchange occurred:

> Ms. Gardner: The reason I tell 'em I wasn't there cause I was afraid for my life. The place I live at is in the projects. Now, I didn't want to get hurt. That was all – every time I heard a noise, I fall to the ground. Every time somebody knock on my door, I jumped, hid in closet, tired of living like that. I started getting really nervous. Then, I got people throwing rocks at my door.
>
> Defense Counsel: I'm talking about --
>
> Trial Court: That's fine. Hold on for --
>
> Defense Counsel: -- what happened when you were at the Criminal Justice Center, okay?
>
> Ms. Gardner: Okay.
>
> Defense Counsel: And, you kept telling them that I don't know the shooter, is that right?
>
> Ms. Gardner: Yeah, I did tell 'em that cause I feared for my life.

The Defendant also notes that Detective Turbeville testified on direct examination that Ms. Gardner was a reluctant witness who was afraid that she could be endangering her life by speaking with the police. Defense counsel did not object to Detective Turbeville's testimony in this regard.

In denying the Defendant's motion for new trial, the trial court stated regarding this issue and Ms. Gardner's testimony:

> The Court finds that the principal witness for the State in this case, Ms. Gardner, was under a state of extreme agitation when she testified before the jury and in a videotaped statement

-33-

shown the jury. The Court finds that it was not error to permit the State to ask Ms. Gardner what was eliciting her otherwise unprovoked behavior. The Court also finds that both parties and the Court agreed to a form of questioning that could be asked to Ms. Gardner regarding her emotional state – questions that would ensure that the jury understood that her agitation came from a general fear of reprisal and not from any threats or negative influence by the Defendant himself.

In each of the incidents raised by the Defendant, Ms. Gardner expressed her general fear, both of reprisal and of living in her neighborhood after she witnessed the shooting. She did not accuse the Defendant of threatening her, and she was not asked if she had been threatened. The record shows that Ms. Gardner become upset and spontaneously expressed fear several times during her testimony.

We conclude that the trial court did not abuse its discretion by finding that Ms. Gardner's testimony addressed a general fear of reprisal for talking to the police rather than an accusation that the Defendant threatened her or engaged in wrong acts apart from the accused offense. We also conclude that there was no misconduct in the prosecutor's questioning Ms. Gardner about her distressed state of mind. The Defendant had the opportunity to cross-examine Ms. Gardner and requested no curative instruction on this matter. The Defendant is not entitled to relief because of statements elicited during Ms. Gardner's testimony.

We next address the Defendant's claim as it relates to the State's questioning of Mr. Begley and Detective Arendall. The Defendant argues that the questions prompting one statement from each witness were examples of prosecutorial misconduct. The prosecutor asked Mr. Begley, who was a resident of the Andrew Jackson Homes, if it was "a good thing to be called a snitch" in that neighborhood. Defense counsel objected, and the trial court sustained the objection and stated, "I don't really [see] where this is going. I mean, I . . . don't think we can go to the next question." The prosecutor did not ask a similar question of Mr. Begley again.

After Detective Arendell testified that people in the neighborhood of the shooting said they heard gunshots but saw nothing, the prosecutor asked, "Is it unusual for people in an area like this to claim they didn't see anything when maybe they did?" Defense counsel objected, and the trial court asked the prosecutor to rephrase the question "a little bit." The prosecutor rephrased by asking if it was unusual to receive the type of response the detective had described, and Detective Arendell said that no, it was a "usual" response because people "don't want to get involved." The prosecutor did not pursue the line of questioning. In

denying the motion for a new trial, the trial court found no instances of misconduct in the prosecutor's questioning of these witnesses.

The Defendant argues that each of these statements showed residents' fear of reprisal and implicated him as engaging in wrong acts of retribution or associating with those who would engage in such wrong acts. See Tenn. R. Evid. 404(b). In each instance, the trial court sustained defense counsel's objection, and the questioning was directed away from the witness's fear of reprisal. The prosecutor did not ask witnesses about any threats made against them and did not question the witnesses beyond the parameters ordered at the pretrial motion hearing. We conclude that the prosecutor's questioning did not prejudice the Defendant's case and that the Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE